UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | No. 4:19-cr-628 HEA (JMB) |
| | ) | |
| ARONDO HARRIS, | ) | |
| | ) | |
| Defendant | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S OBJECTIONS TO
THE PRESENTENCE INVESTIIGATION REPORT**

The Government bears the burden of proof on each disputed adjustment because

each adjustment will increase Harris' offense level if applied. *See United States v. Khang*,

904 F.3d 1219, 1222 (8th Cir. 1990) ("Guideline sentencing is an adversarial proceeding.

Once we embrace the adversarial nature of the sentencing procedure, the burden of proof

falls on the party asserting the sentencing adjustment.") (*abrogated on other grounds by*

*United States v. Anderson*, 618 F.3d 873 (8th Cir. 2010)).

**Objection 1, Paragraph 22:**

The probation office calculates the aggregate loss at $162,800. *See* Presentence

Investigation Report (PSR) at ¶¶ 13, 16, 22. It calculates the loss for each of the three

fraudulently obtained homes as follows: 1405 Switzer, $61,400; 1435 McLaran, $64,000;

and 4041 N. Newstead, $37,400. *See id*. at ¶¶ 9-11, 16. Like the Government, the

probation office calculates these losses based on realtor.com's algorithmic estimate of the

fair market value of the homes.[1] These estimates are not reasonable estimates of the homes' 2019 fair market value. See e.g., Robert A. Shiller, Stock, Bond, and Real Estate Prices Are All Uncomfortably High, N.Y. Times, Oct.1 2021 (reporting that "the prices of stocks, bonds, and real estate…have never been this overpriced simultaneously in modern history"), available at https://timyurl.com/ry2snevc (last visited on Nov. 25, 2021).

First, the probation office's estimates reflect realtor.com's algorithmic estimates of the homes' 2021 fair market value. But, for purposes of U.S.S.G. § 2B1.1, "fair market value is 'the price a willing buyer would pay a willing *seller' at the time of the crime*." *See United States v. Kitan,* 499 Fed.Appx. 187, 193 (3rd Cir. 2012) (emphasis added) ("When property is the object of the fraud, courts may estimate the loss based on the property's fair market value ('FMV'). In the context of § 2B1.1, the FMV is 'the price a willing buyer would pay a willing seller' at the time of the crime.") (internal citations omitted); *United States v. Simpson*, 538 F.3d 459, 463 (6th Cir. 2008) ("As this Court has observed, fair market value is 'the price a willing buyer would pay a willing seller' at the time of the crime.") (citing *United States v. Sosebee*, 419 F.3d 451, 456 (6th Cir. 2005) ("The standard test for determining fair market value is to look at 'the price a willing buyer would pay a willing seller at the time and place the property was

---

[1] According to the Government, the First and Third Circuits have "endorsed the use" of Zillow's computer-based algorithm to estimate the fair market value of property. *See* Government's Response to Defendant's Objections To The Presentence Investigation Report at 1. The Government cites two cases to support its claim. *See id*. But neither case says what the Government claims. In *United States v. Mayendia-Blanco*, 905 F.3d 26 (1st Cr. 2018), the First Circuit merely referenced Zillow in a footnote to illustrate the difference between two approaches to loss calculations in mortgage fraud cases ("the loan-amount-based approach" and the "down-payment-based approach") and to express its preference for the first approach. *Id*. at 36 n. 19; *see also id*. at 35-37. Similarly, in *United States v. Baxter*, 684 Fed.Appx. 133 (3rd Cir. 2017), the Third Circuit simply acknowledged two facts from the proceedings below:  the parties agreed to use Zillow to estimate the fair market value of the victim's property, *see id*. at 135, and, based on their agreement, the "District Court *appeared* to have" used Zillow. *Id*. at n. 4 (emphasis added).

stolen.'") (citation omitted); *see also United States v. Cedeno*, 417 F.3d 1193, 1195 (11th Cir. 2006) (reading fair market value as the value of the property unlawfully taken at the time of the crime); *United States v. Carrington*, 96 F.3d 1, 6 (1st Cir. 1996) (calculating fair market value at the purchase price negotiated with each dealership for the several cars the defendant acquired by fraud); *United States v. Herndon*, 982 F.2d 1411, 1419 (10th Cir. 1992) (loss tends to mean "the fair market value of the property at the time of its theft"). Simply put, realtor.com's algorithmic estimate of the 2021 fair market value of the properties does not represent their 2019 fair market value.

Second, according to realtor.com, its algorithmic estimates do not qualify as a "appraisals." Realtor.com., Home Value Estimates on realtor.com, Frequently Asked Question, Exhibit 1 at 2. Rather, they serve only to "provide insight into a home's *potential* value and should therefore only be considered as a starting point." *Id* (emphasis added). Consistent with this disclaimer, realtor.com repeatedly cautions its users to contact local real estate agents to determine the value of a specific home:

- The home value estimates displayed on realtor.com are designed to offer consumers a broader sense of a home's value. Ultimately, speaking with a local real estate agent who knows the market is your best source for determining the value of a specific home.

- Please contact a professional real estate agent to better understand a home's value in the current market.

- Understanding a home's value can be a complicated matter, especially since the dynamics of the housing market is constantly changing. We encourage you to talk to a knowledgeable real estate agent who can help you decide the best valuation for your home.

Exhibit 1 at 2-3 (emphasis in the original).

Third, realtor.com does not inspect homes in connection with its algorithmic estimates. Thus, relator.com's estimates do not account for varying, price-reducing home conditions, like interior disrepair, foundational defects, and the absence of functioning utilities and/or fixtures, *i.e.*, sinks, toilets, or flooring. Here, the uncontradicted evidence at trial established that all three homes were in various states of disrepair at the time of the offense and, in at least two cases, the homes were uninhabitable.[2] Harris repaired the homes at his own expense[3] and paid off tax liens of $3,000 and $1,000 on the Switzer and North Newstead properties, respectively.[4]

Fourth, expert witness Cathy Shaw-Connely will testify at Harris' sentencing. Ms. Shaw-Connely is a St. Louis realtor with 40-plus years of professional experience. Her family owns and operates Tom Shaw Realtors, a family business that will celebrate its 100th year in operation next year. Ms. Shaw-Connely has provided 2019 property estimates for each of the three homes. To arrive at these estimates, she relied on the following:

- 40-plus years of professional experience as a real estate agent in St. Louis;

- The testimony provided at trial;

- The photographs of the properties and their varying states of disrepair entered into evidence at trial;

- 2019 comparables of similar homes sold in the area of the three properties at issue;

- An in-person view of each of the three homes; and

---

[2] 1405 Switzer had neither running water nor functioning electricity at the time of the offense, and, according to Herron, the property "needed to be rehabbed." *See* Tr. vol II, p. 18. Harris repaired the property's electrical system and restored both services to working order. *See id*. at pp. 142-150.  He also replaced the home's water pipes and installed a waste trap, cable service, a bathroom floor, a toilet, and a kitchen island. *See id*. Likewise, at the time of the offense, the North Newstead home had no running water, no electricity, and no rear door. *See id*. at p. 136. In addition, it needed cabinetry, flooring, central air conditioning, carpet cleaning, kitchen appliances, and a toilet, all of which Harris supplied and installed at his own expense. *See id*. at pp. 136-142
[3] All told, Harris put about $60,000 into the homes at 1405 Switzer and 4041 North Newstead. *See id*. at p. 151.
[4] *See id*. at p. 19, p. 119.

4

- Where present, the recent sale price of each of the homes.[5]

Based on these factors, Ms. Shaw-Connely will testify to low, medium, and high values for each of the properties and opine that the low and medium values are the most reasonable. Ms. Shaw-Connely's low and medium values for each of the properties are $3,500 and $12,500, respectively. These values put the aggregate loss at the time of the offense at between $10,500 to $36,500.

**Objection 2, Paragraph 23**:

According to the probation office, USSG § 2B1.1(b)(2)(A) applies because Leslie Herron suffered a "substantial financial hardship" as a result of the instant offense. Addendum to Presentence Report at 2 [Doc. Text #141]. In particular, the probation office alleges that Herron made "substantial changes to…her living arrangements"[6] and "suffered substantial harm…to her ability to obtain credit." *Id*.

The available evidence does not support these claims. Seemingly, Herron resides at 4542 San Francisco Avenue in St. Louis, Missouri, and, by all appearances, she has lived there since at least 2016, some there years before the instant offense. Herron's current driver's license lists 4542 San Francisco as her home address.[7] Likewise, the case files in two civil suits filed against her in 2016 and 2018 list 4542 San Francisco Avenue as her address at the time the suits were

---

[5] For example, the chain of title for 1405 Switzer shows Antwuan Williams sold the home to Kevin Wallace Davis on September 19, 2016, for $2,000. *See* Exhibit 2, Quitclaim Deed from Antwuan Williams to Kevin W. Davis. On July 30, 2018, less than seven months before the offense, Kevin Wallace Davis sold the home to Leslie Felicia Herron for $1. *See* Exhibit 3, Quitclaim Deed from Kevin W. Davis to Leslie F. Herron. Based on these values, and according to the probation office, the 1405 Switzer home increased in value from $1 to $61,400 dollars in the six months and several weeks that elapsed between July 30, 2018, and the date offense, February 5, 2019.

[6] At trial, Herron offered a single sentence in support of this claim: "I have been displaced for three years living with family members." Tr. vol. II, p. 18.

[7] *See* Exhibit 4, Missouri Department of Revenue, Driver History (last updated December 30, 2020). Harris will offer exhibits 2 through 8 at sentencing. Exhibits 2 through 8 bear the addresses of non-parties, and this district's local rules require redaction of non-party home addresses. *See* Local Rule 2.17.

filed.[8] Moreover, Herron was personally served process at the San Francisco address in both cases.[9] In addition, Herron herself listed 4542 San Francisco as her address on the July 30, 2018, quitclaim deed through which she purchased 1405 Switzer from Kevin Davis,[10] and the 2019 police report she filed in connection with the Switzer property identifies the San Francisco address as her home, as well.[11]  Her current Department of Revenue vehicle registration does the same.[12] Thus, the available evidence indicates that that Herron has lived at 4542 San Francisco since at least 2016 and has that she has made no "change[] to her living arrangements"—substantial or otherwise—since that time.

At trial, Herron did not testify to any offense-related harm to her ability to obtain credit. *See* Tr. vol. II, pp. 9-20.

**Objection 3, Paragraph 24**:

According to the probation office, USSG § 2B1.1(b)(11)(A)(ii) applies because "the notary stamp used by the defendant was identical to the authentic notary stamp issued to K.L. by the state of Missouri." Addendum to Presentence Report at 2 [Doc. Text # 141]. Harris does not contest the substantial similarity between the false notary stamp used to commit the offense and Kelly Ley's authentic stamp. But the substantial similarity between the two stamps simply proves Harris' point: The offense involved the use of a "false authentication feature," not an "authentication feature." This distinction makes a difference.

"When interpreting a statute, [courts] must look first to the plain language of the statute." *Special School District No.1, Minneapolis Public Schools, v. R.M.M., By And Though her*

---

[8] *See* Exhibit 5, *Jury Supervisor v. Leslie F. Herron*, 1622-CC10256; *see also* Exhibit 6*, Wakefield and Associates, Inc., v. Leslie Herron*, 1822-AC10329.

[9] *See* Exhibit 5 at 1, Return of Service on Summons/Petition and Subpoena; *see also* Exhibit 6 at 19, Affidavit of Service.

[10] *See* Exhibit 3 at 1, Quitclaim Deed for 1405 Switzer Avenue, St. Louis, Missouri, 63147, dated July 30, 2018.

[11] *See* Exhibit 7, St. Louis Metropolitan Police Department Incident Report, CN 19-008773 at 2.

[12] *See* Exhibit 8, Department of Revenue Vehicle Registration for Carelyn Jean Herron & Leslie Herron.

*Parents, O.M. and T.M.*, 861 F.3d 769, 774 (8th Cir. 2017). "When a statute's language is plain, the sole function of the courts is to enforce the statute according to its terms." *Id*. "[Courts] determine legislative intent 'primarily from the language of the statute itself,'" and "must presume 'that a legislature says in a statute what it means and means in a statute what it says.'" *Id*. These same rules apply when courts interpret a guideline. *See United States v. Nevarez-Espino*, 419 F.3d 926, 927 (8th Cir. 2006) ("When construing the Guidelines, we look first to the plain language, and where that is unambiguous we need look no further.") (citation omitted).

Section 2B1.1(b)(11) provides,

> If the offense involved (A) the possession or use of any…(ii) *authentication feature*; (B) the production or trafficking of any (i) unauthorized access device or counterfeit access device, or (ii) *authentication feature*; or (C)(i) the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification, or (ii) the possession of 5 or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification, increase by **2** levels.

U.S.S.G. § 2B1.1(b)(11)

The language of § 2B1.1(b)(11) plainly applies to "authentication feature[s]." But it does not plainly apply to "false authentication feature[s]." Indeed, § 2B1.1(b)(11) does not mention "false authentication feature[s]" at all. The same holds for the relevant Application Notes, Notes 10(A) and 10(B).

Note 10(A) defines "authentication feature." It does not, however, define "false authentication feature." What's more, Note 10(A) defines "authentication feature" by reference to the definition supplied to the term by 18 U.S.C. § 1028(d)(1). But 18 U.S.C. § 1028(d)(1) does not define "false authentication feature." 18 U.S.C. § 1028(d)(5) defines "false authentication feature" and classifies it as a "term" separate and distinct from "authentication feature." Note

10(A)'s reference to § 1028(d)(1) and its failure to reference to § 1028(d)(5) further supports the claim that subsection (b)(11) only applies to the former.

Note 10(b) supports this claim, too. Under Note 10(b), subsection (b)(11) applies to "[o]ffenses involving authentication features, identification documents, false identification documents, and means of identification." Thus, Note 10(b) explicitly references both "identification documents' and "false identification documents" and, by its plain terms, applies to both. In contrast, Note 10(b) does not reference "authentication features" *and* "false authentication features." It references only the former. The text of Note 10(b) thus demonstrates the Commission's knowledge of the distinction between genuine and false "identification document[s]"and reflects the Commission's determination to apply subsection (b)(11) to both. Surely, the Commission did not overlook this same distinction in the context of "authentication feature[s]." Indeed, it could not have, since (1) all four terms ("authentication feature," "identification document," "false identification document," and "false authentication feature") appear within 18 U.S.C. § 1028, a statute referenced at least five times in § 2B1.1's Application Notes, and (2) 18 U.S.C. § 1028 defines all four terms in separate but proximate subdivisions: subdivision (d)(1), (d)(3), (d)(4), and (d)(5), one of which (subdivision (d)(1)) Application Note 10(A) expressly references. In short, the Commission did not simply overlook the term "false authentication feature" when it wrote § 2B1.1(b)(11) and its Application Notes. Rather, it intentionally omitted it and, by design, excluded it from § 2B1.1(b)(11)(A)'s application.

Respectfully submitted,

By:     */s/ Adam D. Fein*

ADAM D. FEIN # 52255
Attorney for Defendant
120 South Central Avenue, Suite 130
Clayton, Missouri 63105
(314) 862-4332
afein@rsflawfirm.com.

### CERTIFICATE OF SERVICE

I hereby certify that on November 27, 2021, the foregoing was electronically filed with the Clerk of the Court to be served by operation of the Court's electronic filing system upon Ms. Tracy L. Berry, assistant United States attorney.

9