UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 4:19-cr-628-HEA-1 |
| | ) |
| ARONDO HARRIS, | ) |
| | ) |
| Defendant. | ) |

**SENTENCING MEMORANDUM**

COMES NOW Defendant, Arondo Harris (Harris), by and through counsel, and files the following memorandum for sentencing.

### I. Procedural background

On May 26, 2021, a jury found Harris guilty on counts one through six of a six-count indictment. *See* Presentence Investigation Report (PSR) at ¶ 1. On August 31, the probation office disclosed its initial version of the presentence investigation report and calculated therein a total offense level of 22, a criminal history category of I, and an advisory guideline range of 41 to 51 months. *See id*. at ¶¶ 31, 36, 70. On September 28, Harris filed his objections to the PSR, which if sustained, would yield a total offense level of 12, a criminal history category of I, and a Zone C advisory guideline range of 10 to 16 months. These two calculations aside, Harris merits a sentence of probation with a condition of community service based on his history and characteristics. He also merits a sentence of probation because, on the available evidence, a sentence of probation with a condition of community service will prove sufficient, but not greater than necessary, to comply with the purposes of sentencing.

1

## II. Harris' History and Characteristics

Harris 's history and characteristics are discussed in the PSR, the letters submitted to this Court, and section III.A.3 below.

## III. The Purposes Of Sentencing

A sentence of probation will prove sufficient but not greater than necessary to comply with the purposes of sentencing.

### A. Just Punishment

Among others, this Court should consider three factors in assessing just punishment in this case.

#### 1. Congressional Legislation Classifies Harris As Among those Who Generally Merit Probation

Congressional legislation identifies Harris as among the offenders who generally merit a non-custodial sentence. In delegating sentencing authority to the United States Sentencing Commission (the Commission), Congress directed the Commission to impose sentences "other than imprisonment" on non-violent first offenders who commit other than serious offenses:

> The Commission shall insure that the guidelines reflect *the general appropriateness* of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense, and the general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury.

28 U.S.C. § 994(j) (emphasis added).

Harris is a criminal history category I offender with no criminal history points and only one prior criminal sentence: a one-year SIS from more than a 17 years ago for possession of misdemeanor amount of marijuana. *See* PSR at ¶¶ 34-38. In addition, Harris did not commit a

crime of violence. And Congress has categorized his counts of conviction as among the least serious felonies by designating them Class E offenses[1] with a range of punishment that permits probation and limits imprisonment to a term of not more than five years. *See id*. at ¶ 69. Title 18 U.S.C. § 994(j) thus identifies Harris as within the class of offenders who generally merit a sentence of probation.

2.  **Restitution Is Punishment**

Restitution is punishment, *see United States v. Williams*, 128 F.3d 1239, 1241 (8th Cir. 1997) ("We conclude an order of restitution under the MVRA is punishment…."); *see also United States v. Edwards*, 162 f.3d 87, 92 (3rd 1998); *United States v. Bearden,* 274 F.3d 1031, 1042 n. 4 (6th Cir.2001); *United States v. Richards,* 204 F.3d 177, 213 (5th Cir.2000) (overruled on other grounds by *United States v. Cotton*, 535 U.S. 625 (2002)); *United States v. Siegel,* 153 F.3d 1256, 1260 (11th Cir.1998); *United States v. Rezaq,* 134 F.3d 1121, 1141 n. 13 (D.C. Cir.1998); *United States v. Baggett,* 125 F.3d 1319, 1321-22 (9th Cir.1997); *United States v. Thompson,* 113 F.3d 13, 15 n. 1 (2nd Cir.1997), the purpose of which is "to make the victims of crime whole," "fully compensate them for their losses and restore [them] to their original state of well-being." *United States v. Balentine,* 596 F.3d 801, 806 (8th Cir. 2009) (citation omitted). The guidelines do not account for this punishment in their general operation. Ordinarily, this omission is of no moment. But here it is notable. At the time of the offense, the Switzer and North Newstead homes were uninhabitable.[2] Harris rendered them habitable through a substantial commitment of time, energy, and money.[3] As a result of these commitments, Harris

---

[1] There are five classes of federal felony offenses: Class A, Class B, Class C, Class D, and Class E. *See* 18 U.S.C. § 3559(a). Class E consists of least serious offenses.

[2] At trial, Leslie Herron herself testified that the Switzer property "needed to be rehabbed." *See* Tr. vol II, p. 18. For his part, Ronald Towns testified that he last visited the Newstead property in 2017. *See id*., p. 117. Harris testified that the Newstead property had been vandalized before he bought it in 2019 and that several homeless people were living there when he began to rehab it. *See id*., pp. 136-137.

[3] At trial and without contradiction, Harris testified that he put some $60,000 into the Switzer and North Newstead

3

will return the homes to the victims in a condition vastly improved with respect to state of repair and value from their condition at the time of the offense. Moreover, he will do so without financial consideration or offset. Consequently, through restitution, Harris will return to the victims more than he took and, at substantial financial cost, place them in a better position than the *status quo ante*. This result is atypical[4] and represents a substantial punishment unaccounted for by any statutory or guideline assessment of just punishment.

### 3. Probation Is Punishment

Like restitution, "[p]robation is punishment," too. *Taylor v. State of Rhode Island*, 101 F.3d 780, 783 n. 6 (1st Cir. 1996); *see also United States v. Walker*, 252 F.Supp.3d 1269, 1293 (D. Utah 2017). As the Supreme Court has recognized, "[o]ffenders on probation are…subject to several standard conditions that substantially restrict their liberty." *Gall v. United States*, 552 U.S. 38, 48 (2007). For example,

> [p]robationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from drinking. Most probationers are also subject to individual 'special conditions' imposed by the court.

*Id.*; *see also Korematsu v. United States*, 319 us 432, 434-435 (1947) (A probationer "must obey the terms and conditions imposed upon him, or subject himself to a possible revocation or modification of his probation; and under some circumstances he may, during the probationary period, be required to pay a fine, or make reparation to aggrieved parties, or provide for support of the persons for whom he is legally responsible. He is under the 'supervision' of the probation

---

properties. *See id.,* p. 151. He also paid the outstanding taxes on both properties. *See id.*, p. 19, p. 119.
[4] *Cf. United States v. Shepard*, 269 F.3d 884, 887 (7th Cir. 2001) (noting restitution may not exceed a victim's actual loss and reducing restitution by the amount of stolen funds the defendants used to improve the victims' home).

officer whose duty is to make reports to the court concerning his activities and at 'any time within the probation period the probation officer may arrest the probationer wherever found, without a warrant, or the court which has granted the probation may issue a warrant for his arrest. These and other incidents of probation emphasize that a probation order is 'an authorized form of …punishment….") (citations omitted).

As punishment, "[p]robation, like parole, 'is intended to be a means of restoring offenders who are good social risks to society." *Korematsu*, 319 U.S. at 435 (1947) (citation omitted). Harris is a "good social risk[] to society." At 42, he has no meaningful criminal history, no history of violence, and he has worked since the age of 16. He is also skilled in restoring distressed homes and has restored such homes in the St. Louis area since 2016. To date, he's restored more than six distressed homes, including the home in which he lives with his significant other and their two-year-old child. To accomplish this end, Harris has hired underemployed individuals, paid them a meaningful wage, and worked alongside them. Harris can use his home repair skills to assist the citizens of St. Louis through community service. For example, he can perform community service with non-profits like Habitat for Humanity and through projects like the City of St. Louis' Healthy Home Repair Program—a program that provides home repair assistance to low- and moderate-income households. As he already does, he can also use his assets to provide important services to needy families in North St. Louis. For instance, Harris owns and operates D&S Laundromat. *See* PSR at ¶ 62. D&S does not generate significant income and, during some months, it operates at a loss. *See id*. Still, Harris keeps the business open and makes it available each month to low-income families to use free of charge. According to Olutayo Folarin, the owner of the property on which D&S stands, "Mr. Harris often offers free wash days and free supplies for community members. He has been an asset to not

5

only the community, but to me as a tenant." Exhibit 1 [Letters for Sentencing]. Harris' longtime insurance agents have also observed his long-held commitment to the community. Jaime Richards, Harris' agent of more than eight years, writes, Harris "has a strong sense of duty, which applies to…the hard work and dedication [he gives] to the betterment of his community and neighborhood." Exhibit 2 [Letter from Jamie Richards]. Richards and Scott Holdridge, Harris' agent of 16 years, also attest to Harris' "integrity," "kind[ness], and "generous[ity]." Exhibits 2, 3 [Letters from Jamie Richards and Scott Holdridge].

Harris' commitment to those closest to him reveals his status as a "good social risk[]," as well. Harris has seven children and several stepchildren, all of whom he supports. *See* Exhibit 1. He also supports their mothers, like Amanda King, with whom Harris has a four-year-old son. *See id*.  King suffers from major depression, a mental illness that has left her unable to hold steady employment. *See id*. Her illness also affects her "ability to function as a mother and perform daily living activities." *Id*. According to King, without Harris, she "would not have the means to get the help and care [she] need[s] or to provide for [her]self and her children." *Id*. Laconia Adams shares this sentiment. Adams and Harris co-parent their 13-year-old son, and Harris provides for half of their son's expenses. *See id*. Adams lost her first-born son four years ago. *See id*. His death "traumatized" her 13-year-old son for whom she and Harris subsequently sought counseling. *See id*. According to Adams, since her older son passed, "[o]ur lives have changed dramatically, and Arondo is crucial to us. I have relied on Arondo more than ever for our son. We need him emotionally, financially, and physically." *Id*. The mothers of Harris' remaining children write much the same and confirm Harris' dedication to his children and stepchildren alike. *See id*. Antwon Johnson, Harris nephew who was released from the Missouri Department of Corrections in 2019, echoes their thoughts. According to Johnson, "[w]hile in the

6

Department of Corrections, my uncle helped support me financially. Since I've returned home, I've supported myself as a mechanic and through odd jobs. I do not always make enough to get by and my uncle continues to support me. I know he supports others financially too. My uncle's assistance to me and others shows his true character and the important role he fills in my life and the lives of others." *Id*.

Harris' history and characteristics, as confirmed in the PSR and attested to by others, thus demonstrate his status as a "good social risk" who is worth "restoring" and the kind of individual for whom probation with a condition of community service is appropriate. In addition, a sentence of probation will not annul his felon-status or the disabilities that come with it, penalties in their own right that will endure for the duration of his life.

### B. General Deterrence

A sentence of imprisonment will not better promote general deterrence than will a sentence of probation. Little credible evidence suggests increases in sentence severity reduce crime through general deterrence. *See e.g.*, Kelli D. Tomlinson, *An Examination of Deterrence Theory: Where do We Stand?*, 8-Dec. Fed. Probation 33 (2016) (concluding "non-legal factors, such as marriage, employment, peers, morality, disapproval from loved ones, ostracism, and shame, hav[e] more impact on conformity than do sanctions and threats"); *see also* Cheryl Marie Webster and Anthony N. Doob, *Searching for Sasquatch: Deterrence of Crime through Sentence Severity*, The Oxford Handbook of Sentencing and Corrections, p. 174-175, Oxford University Press (2012) ("Despite enormous research efforts, no credible consistent body of evidence has been found to support the conclusion that harsher sentences (within ranges conceivable in Western democracies) achieve marginal deterrent effects on crime.");Valerie Wright, Ph.D., Research Analyst, The Sentencing Project, *Deterrence in Criminal Justice: Evaluating Certainty*

7

*Versus Severity of Punishment* at 9 (2010) ("Existing evidence does not support any significant public safety benefit of the practice of increasing the severity of sentences by imposing longer prison terms. In fact, research findings imply that increasingly lengthy prison terms are counterproductive."); Anthony N. Doob, Cheryl Marie Webster and Rosemary Gartner, *Issues Related to Harsh Sentences and Mandatory Minimum Sentences: General Deterrence and Incapacitation,* at A-3, University of Toronto, Centre for Criminology & Social Studies, (2014) ("At this point, we think it fair to say that we know of no reputable criminologist who has looked carefully at the overall body of research literature on 'deterrence through sentencing' who believes that crime rates will be reduced, through deterrence, by raising the severity of sentences handed down in criminal courts."); Michael Tonry, *Learning from the Limitations of Deterrence Research*, Chicago Journals, Crime and Justice, Vol. 37, No. 1, University of Chicago Press (2008), pp 301-302 ("It is unclear to me which is more surprising: that so little credible evidence exists that criminal behavior is much affected by changes in punishment policies or that policy makers continue to believe that policy changes significantly affect behavior and that research continues to test for their crime-preventive effects.").

"Three National Academy of Science panels, all appointed by Republican presidents, [have] reached [this] conclusion, as has every major survey of the evidence." Michael Tonry, *Purposes and Functions of Sentencing, 34 Crime and Justice*: A Review of Research 28-29 (2006).

Research abroad has concluded the same, *see, e.g.*, Andrew Von Hirsch, et. al., Cambridge University, *Criminal Deterrence and Sentence Severity*: *An Analysis of Recent Research* (1999) (finding no data to support a statistically significant correlation between increases in sentence severity and crime rate reductions); David Farrington, et al., *Changes in*

*Crime and Punishment in America, England, and Sweden between the 1980s and the 1990s*, Studies in Crime Prevention, 3:104-131 (1994) (comparing crime and punishment trends in the United States, England, and Sweden and failing to detect any increase in general deterrence as a result of increases in sentence severity), and Commission data support these conclusions. For example, between 2002 and 2019, the frequency of § 2B1.1 sentencings remained essentially the same, despite the increased sentences imposed on economic offenders in that same time, a result of § 2B1.1 amendments promulgated in the wake of the Sarbanes-Oaxley Act of 2002. *See* United States Sentencing Commission, *Use of Guidelines and Specific Offense* Characteristics (2002 through 2019) (documenting the number of § 2B1.1 sentencings for each calendar year between 2002 and 2019 as follows: 5,189 in 2002; 7,089 in 2003; 7,066 in 2004; 6,850 in 2005; 7,369 in 2006, 7,920 in 2007; 8,123 in 2008; 7,951 in 2009; 8,343 in 2010; 8,504 in 2011; 8,730 in 2012; 8,410 in 2013; 8.465 in 2014; 7,919 in 2015; 7,156 in 2016; 6,436 in 2017; 6,044 in 2018; and 5,845 in 2019). This outcome is at odds with the fundamental premise of deterrence through sentencing severity, which posits that longer sentences will decrease the incidence of crime over time, not leave them unchanged or increased.

### C. Incapacitation

Incapacitation does not justify a sentence in excess of probation, either. Harris' criminal history category I status reflects his reduced re-offense risk relative to similarly situated offenders in all other criminal history categories. *See* United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, pp. 28-30 (May 2004) [hereinafter Measuring Recidivism]. But his re-offense risk is lower than most criminal history category I offenders, as well. Harris is a 42-year-old fraud defendant with a high school diploma and a long history of employment, who has lived with his

9

significant other for ten years. *See* PSR at ¶¶ 47, 59, 64-66. The guidelines' criminal history measure excludes these several variables from its calculus. *See generally, Measuring Recidivism*. Yet, according to the Commission, these variables strongly correlate with reduced re-offense rates,[5] *see id*. at 28-30 and distinguish Harris as substantially less likely to re-offend than most of his criminal history category I counterparts.

The Commission's most recent recidivism report supports this larger conclusion. The Commission published its most recent report just over 12 months ago. In contrast to its prior reports, this report examined the relationship between length of incarceration and recidivism. *See* United States Sentencing Commission, *Length of Incarceration and Recidivism* (April 29, 2020). In particular, the report examined data from a multi-year, multi-model study based on a sample of "25,431 federal offenders who were released into the community, either from federal prison or on probation, in calendar year 2005." *Id*. at 5. The report makes three key findings, one of which is relevant here. *See id*. at 4. According to the report, the data uncovered "[n]o statistically significant relationship between length of incarceration and recidivism…for offenders incarcerated for 60 months or less." *Id*. at 28-30. In other words, sentences of 60 months produced no reliably greater specific deterrence effect than did sentences of shorter durations. *See id*. at 4. This finding is of consequence for two reasons. First, here, the guidelines advise a sentence of less than 60 months, whether under the probation office's or Harris' calculation. Second, Congress directs courts to impose sentences "not greater than necessary" to comply with

---

[5] For example, according to the Commission, criminal history category I defendants over the age 41 are among the federal defendants who are the least likely to reoffend, second only to category I defendants aged 60 or older. *See id*. at 28. Likewise, among all federal defendants, fraud, theft, and embezzlement defendants are the least likely to reoffend. *See id*. at 30; *see also* United States Sentencing Commission, Recidivism of Federal Offenders Released in 2010 at 5 (Sept. 2021). Similarly, defendants with high school diplomas are less likely to reoffend than offenders with some college education or no high school diploma, defendants employed in the year prior to their offense are less likely to reoffend than defendants without such employment, and defendants involved in long-term relationships are less likely to re-offend than defendants who are not involved in long-term relationships or have never married. *See* Measuring Recidivism at 29.

10

the purposes of sentencing, including the purpose of specific deterrence. 18 U.S.C. § 3553(a)(2)(C). In this case, the guidelines' advice runs counter to this directive precisely because, on the evidence, a 12 to 18 or 41 to 51-month sentence will produce no greater specific deterrence effect than will a sentence of probation. Together, § 3553(a) and the Commission's report thus justify a sentence probation.

### D. Rehabilitation

Harris has no rehabilitative needs.

### IV. Conclusion

For the foregoing reasons Defendant Arondo Harris respectfully requests a sentence of probation with a condition of community service. Among other things, a sentence of probation will account for (1) Harris' pro-social history and characteristics, (2) the substantial financial cost he will incur without consideration or offset through return to the victims of the properties he restored, and (3) the congressional judgment that offenders with his profile generally merit a sentence of probation—all of which the guidelines disregard. In addition, on the available evidence, a sentence of probation will better meet the purposes of sentencing than will sentence of any duration of imprisonment. At the same time, a sentence of probation will punish Harris, as the Supreme Court has recognized, but also benefit the community through a requirement of community service.

        Respectfully submitted,

By:   */s/ Adam D. Fein*

ADAM D. FEIN # 52255
Attorney for Defendant
120 South Central Avenue, Suite 130
Clayton, Missouri 63105
(314) 862-4332
afein@rsflawfirm.com.

## CERTIFICATE OF SERVICE

    I hereby certify that on November 28, 2021, the foregoing was electronically filed with the Clerk of the Court to be served by operation of the Court's electronic filing system upon Ms. Tracy L. Berry, assistant United States attorney.